# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

**UNITED STATES OF AMERICA**

**ELECTRONIC CRIMINAL COMPLAINT**

*v.*

**JOSEPH DON MOUNT**

**CASE NUMBER:** 21-4119MJ

I, the undersigned, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## COUNT 1

On or about October 24, 2020, within Grand Canyon National Park, in the District of Arizona, the defendant, JOSEPH DON MOUNT, did knowingly give a false or fictitious report or other false information to an authorized person investigating an accident or violation of a law, in violation of 36 C.F.R. § 2.32(a)(3)(i).

## COUNT 2

On or about October 24, 2020, within Grand Canyon National Park, in the District of Arizona, the defendant, JOSEPH DON MOUNT, did intentionally interfere with a government employee or agent engaged in an official duty, in violation of 36 C.F.R. § 2.32(a)(1).

## COUNT 3

On or about October 24, 2020, within Grand Canyon National Park, in the District of Arizona, the defendant, JOSEPH DON MOUNT, did engage in and solicit business in a park area, without a permit, contract or other written agreement with the United States, in violation of 36 C.F.R. § 5.3.

## COUNT 4

On or about October 24, 2020, within Grand Canyon National Park, in the District of Arizona, the defendant, JOE MOUNT, did violate a closure, designation, use or activity restriction, or public use limit- Public use rim to rim group size limit, in violation of 36 C.F.R. § 1.5(f).

## COUNT 5

On or between October 24, 2020 and October 25, 2020, within Grand Canyon National Park, in the District of Arizona, the defendant, JOSEPH DON MOUNT, did violate a closure, designation, use or activity restriction, or public use limit- Covid-19 mitigation use limit, in violation of 36 C.F.R. § 1.5(f).

CC: USMS & PTS

I further state that I am a United States Park Ranger with the National Park Service, with the Grand Canyon National Park, and that this Complaint is based on the following facts: **SEE ATTACHED AFFIDAVIT.**

REVIEWED BY: *ls AUSA Patrick J. Schneider*

  X    Pursuant to 28 U.S.C. §1746(2), I declare
          that the foregoing is true and correct.

<u>Timothy Hopp, United States Park Ranger</u>
Complainant's Name and Title

Complainant's Signature     5/4/2021   Date

  X   Sworn by Telephone

<u>May 4 at 2:19 pm</u>
Date/Time

Flagstaff, Arizona
City and State

<u>Camille D. Bibles, U.S. Magistrate Judge</u>
Name & Title of Judicial Office

Signature of Judicial Officer

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

## AFFIDAVIT

I, Timothy Hopp, being duly sworn, state the following

1. I am a United States Park Ranger (USPR) with the National Park Service
   (NPS), United States Department of the Interior.  I am presently assigned to
   the Intermountain Region, duty stationed at Grand Canyon National Park
   (GCNP), in the District of Arizona.  I have been employed as a USPR with
   the National Park Service since 2013 and have worked in parks all over the
   country.  I received training at the Federal Law Enforcement Training
   Center and I completed the Land Management Police Training Program.  I
   attended numerous training courses in a variety of law enforcement subjects
   and have conducted criminal investigations into a variety of offenses.

2. The facts and information herein are based upon my personal observations
   and knowledge of the investigation, as well as information provided to me
   by Supervisory USPR Corinne Oakes, USPR Adam Sherman, USPR
   Katherine McHugh, as well as other park staff members and witnesses.  This
   affidavit does not include each and every fact or occurrence in the matter
   observed by me or known to the Government.

3. Your Affiant respectfully submits the following criminal statutes have been
   violated:

a.  Title 36, Code of Federal Regulations, Section 2.32(a)(3) states:
    Knowingly giving a false of fictitious report or other false information
    (i) to an authorized person investigating an accident or violation of
    law or regulation.

b.  Title 36, Code of Federal Regulations, Section 2.32(a)(1) states:
    Intentionally interfering with a government employee or agent
    engaged in an official duty, or on account of the performance of an
    official duty.

c.  Title 36 Code of Federal Regulations, Section 5.3 states: Engaging in
    or soliciting any business in park areas, except in accordance with the
    provisions of a permit, contract or other written agreement with the
    United States, except as such may be specifically authorized under
    special regulations applicable to a park area, is prohibited.

d.  Title 36 Code of Federal Regulations, Section 1.5(f) states: Violating
    a closure, designation, use or activity restriction or condition schedule
    of visiting hours, or public use limit, is prohibited (public use rim-to-
    rim group size limit).

e.  Title 36 Code of Federal Regulations, Section 1.5(f) states: Violating
    a closure, designation, use or activity restriction or condition schedule

of visiting hours, or public use limit, is prohibited (Covid-19 mitigation use limit).

4. On 24 October 2020, Joseph Don MOUNT organized an approximate 153-person rim-to-rim hiking group from the North Rim of Grand Canyon National Park, through the inner canyon, and out the South Rim, the culmination of many months of planning, organizing and leading. J. MOUNT collected thousands of dollars from participant registration fees in exchange for services which included guide services, logistics, commercial bus transportation, and hotel lodging. J. MOUNT knowingly and willfully encouraged participants to travel through the canyon despite advisements from park officials to the contrary, provided participants with tips and information to circumvent park laws, and denied leading any large scale-rim-to-rim groups to investigating park officials throughout.

5. Rim-to-rim groups in excess of 30 participants are not permitted rim-to-rim through the inner canyon, defined as the areas below the Tonto Platform from the South Rim and below Manzanita Resthouse from the North Rim. Groups may not break up into smaller groups to accommodate group size (2019 signed Superintendent's Grand Canyon National Park Compendium (50)(b); 36 CFR 1.5(f)).

6.  Engaging in or soliciting any business requires a permit, contract, or other
    written agreement with the United States or must be pursuant to special
    regulations.  Commercial Use Authorizations (CUAs) are required for all
    commercial visitor services provided by entities not based in the park (2019
    signed Superintendent's Grand Canyon National Park Compendium (51); 36
    CFR 5.3).

7.  On 17 September 2020, 'Asher Lawden,' a pseudonym, emailed Catherine
    Mosseller of the Grand Canyon Permits office to complain about a 100+
    person rim-to-rim hiking group that was scheduled for 24 October 2020 at
    Grand Canyon National Park.  A. Lawden submitted several Facebook
    screenshots as evidence of the group's intentions.  In the first set of
    screenshots, J. MOUNT posted "112 COMMITTED HIKERS COMING
    FROM 12 DIFFERENT STATES!!!!" and added "if you want to keep
    inviting friends, I am determined to make this work for as many who want to
    go!" Screenshots of a Facebook feed revealed that several participants had
    "paid Joe Mount."

8.  On or about 21 September 2020, A. Lawden submitted additional
    screenshots of J. MOUNT's Facebook event page to C. Mosseller.  In one
    screenshot, J. MOUNT wrote the following to a participant: "But there are
    precautions we might need to take so as to [sic] not draw attention to such a

large group while on the trail. A natural spread might be best. Will research
this more and present details/meet ups/hiking plans in posts to follow over
the coming weeks."

9. Despite posts and emails to the contrary, Mr. Mount denied to a park official
that he was planning any sort of large-scale rim-to-rim hike. On 21
September 2020, J. MOUNT contacted Catherine Mosseller of the Grand
Canyon Commercial Permits Office. C. Mosseller reported that J. MOUNT
had said he was taking a group of 12 people rim-to-rim. However,
according to Facebook posts, J. MOUNT already had approximately 118
people registered by that date. C. Mosseller wrote she had told J. MOUNT
the "Maximum group size was 11" and "Groups of 10 or less people do not
require a permit." She wrote that J. MOUNT asked about splitting the group
up to accommodate the group size limit, to which C. Mosseller stated "this
was not allowed."

10. On 22 September, C. Mosseller emailed A. Lawden to say "I provided him
[J. MOUNT] with the rules and regulations and told him multiple times
about the group size limit."

11. According to posts on the Facebook group event page, J. MOUNT continued
to defy park regulations despite receiving official advisements from a park
employee in the permits office. These Facebook posts show that J. MOUNT

continued to plan, manage, lead and recruit participants for the rim-to-rim hiking event.

12. On 23 September 2020, two days after his conversation with C. Mosseller, J. MOUNT posted: "ONE MORE DAY TO SIGN UP!" In this post, he advised participants to answer his "9" questions, some of which concerned carpool groups, cabin arrangements, gender preferences, walkie talkie subgroups, and prior rim-to-rim experiences.

13. On 1 October 2020, J. MOUNT posted a shared housing arrangement document, entitled Grand Canyon R2R Housing.  He posted "It has taken me way too long trying to figure out everyone's friend groups and preferences." J. MOUNT asked participants to collaborate in completing these room assignments within a set of parameters that he established.

14. That same day, J. MOUNT posted a draft "Preliminary Hour-by-Hour Itinerary" encompassing multiple days.

15. On 2 October 2020, your Affiant contacted A. Lawden by telephone. During the phone call, A. Lawden identified J. MOUNT as the group organizer and said he was charging participants $95 via the cashless app, VENMO.  A. Lawden said he had informed J. MOUNT a permit may be required to conduct commercial activities at Grand Canyon.

16. On 5 October 2020, J. MOUNT posted an "Important Announcement," in which he asked participants to submit a list of questions for him to answer. He wrote "As trip leader, this helps prevent redundancy." He posted a refund policy, telling participants "preparation is paramount" and "you have 2 weeks to request a full refund and I will VENMO you the $95 back" and everyone else should "TRAIN HARD!!!"

17. On or about 6 October 2020, USPR C. Oakes joined the Facebook group event page with help from A. Lawden, allowing park investigators to see all past, present and future group-related posts and comments.

18. On 6 October, J. MOUNT posted a draft financial spreadsheet. J. MOUNT wrote that the group is "$53 'in the green'" and he currently has "170" participants signed up. The financial spreadsheet showed allocated costs for hotel rooms, buses, fuel, drivers, tips and walkie talkies. According to the spreadsheet, the total budget was $16,340.

19. On 8 October 2020, your Affiant contacted J. MOUNT regarding the planned rim-to-rim hike. Despite posts and emails to the contrary, Mr. Mount denied to the Affiant that he was planning any sort of large-scale rim-to-rim hike. Despite having upwards of 170 participants registered at that moment, J. MOUNT stated to the Affiant that he was not taking a 'large group' of people across the canyon, that he had only been inquiring about

taking a 'small group' composed of close rugby associates and family friends. Your Affiant stated approximately a dozen times the group size limit for rim-to-rim groups is 11 people and groups cannot be split up to accommodate or circumvent the group size limit during the Covid-19 pandemic. Your Affiant added that in non-pandemic years, a Special Use Permit (SUP) is required for rim-to-rim hiking groups of between 12 and 30 people and that under no circumstances can organized groups exceed 30 people in a non-pandemic year.

20. On 9 October 2020, J. MOUNT posted an "IMPORTANT ANNOUNCEMENT" in which he wrote he had received a "call from Ranger Hopp" who "instructed that R2R group sizes are to be 11 people or less."

21. J. MOUNT posted the following weblink from Grand Canyon National Park: https://www.nps.gov/grca/learn/management/sup.htm.

22. J. MOUNT posted the following content from the weblink regarding rim-to-rim hiking group size:

    a. "Organized Group Rim-to-Rim and Extended Day Hike/Run

    b. Groups whom must obtain a permit:

    c. Organized Non-Commercial Groups are defined as any group traveling together, such as scouts, a club, a church, a meet up group,

or a family/friend group that has created its own itinerary. Group size
- 1-11 people. Permits are required for group sizes of 11. Ten people
or less do not require a permit."

23.J. MOUNT published a disclaimer, in which he wrote some of the following:

    a.  "It's best I back down as trip leader. However, the cabins/hotels in
        Kanab are still booked. You still have a bed spot if you want
        it….anyone who makes it to the South Rim October 24th will have a
        guaranteed ride back to the North Rim."

    b.  "As you could imagine, a park official telling me I can't hike the R2R
        with more than 11 people isn't going to prevent me from doing one of
        the greatest hikes in the planet."

    c.  "Remember – there is nothing stopping you from hiking the Grand
        Canyon on this day. There is nothing stopping you from doing a little
        research to be best prepared. However, there is now a target on my
        back and this is the best way I know how to still hike R2R and not be
        tied to any of you."

    d.  "I hope you all recognize the position I'm in. I've spent countless
        hours organizing this, but when Ranger Hopp calls up…I must
        separate myself from all of you."

24. J. MOUNT knowingly interfered with park agency functions by encouraging participants to circumvent park rules. In Facebook posts, J. MOUNT advised participants that the group size rim-to-rim hiking limit is 11 and told them to "Organize groups of 11 or less.... To be safe, I'd suggest 10 or less." He directed participants to avoid "12 or more people in [their] group doing the R2R" because "you could be stopped and cited by park enforcement officers." He suggested everyone bring walkie-talkies "as part of YOUR OWN individual hiking group" because "I will not be providing these because again – it ties me to you WHILE IN THE CANYON." He continued: "Remember – there is nothing stopping you from hiking the Grand Canyon on this day. There is nothing stopping you from doing a little research to be best prepared." Those who go, he continued, will have "guaranteed" access to lodging and shuttle services when the hike is completed.

25. J. MOUNT wrote "I am still planning to hike the Grand Canyon" and a "park official telling me I can't hike the R2R with more than 11 people isn't going to prevent me from doing one of the greatest hikes on the planet." J. MOUNT continued: "Ranger Hopp – this is my plausible deniability. I am no longer leading a group through Grand Canyon on 10/24. I am simply going with my 10 (or less) closest friend and family." He added: "won't be a

coordinated hike while ON THE TRAIL" and all "can come or not." J.

MOUNT wrote that he would be "following the same itinerary with MY

OWN group of 11 or less....you are welcome to do the same...independent

of me" and reminded participants "you ARE NOT WITH ME ON THE

TRAIL."

26. J. MOUNT knowingly and willfully violated Grand Canyon's rim-to-rim

pubic use group size limit of 30 individuals. On 18 October 2020, J.

MOUNT posted "153. Final list. Check it." J. MOUNT published a list of

every participant and advised everyone of the "MUST BRING ITEMS" to

include headlamps, appropriate clothing for the temperatures, first aid

material, walkie talkies, park passes, "proven" hiking shoes, and a "positive

'can do, will do' attitude."

27. On 20 October 2020, J. MOUNT posted his intent to ensure accountability

of each person and guaranteed everyone would have a shuttle ride back to

Kanab. He stated "IF YOUR NAME IS BELOW, I AM WAITING ON

THE SOUTH RIM UNTIL I SEE YOU'VE MADE IT ONTO A VAN OR

BUS" and that "I will stay all night if I have to" and that "Making sure ever

[sic] single person is accounted for is my #1 prerogative."

28. J. MOUNT posted the final group itinerary, directing everyone to "SAVE A

COPY TO YOUR PHONES." The itinerary showed Check-in at the Red

Canyon Cabins and Quality Inn in Kanab, Utah, for Friday, 23 October

2020, and a "Weekend overview & Logistics" talk at 9 PM at the Quality

Inn Conference room.  Regarding the 0640 (Utah time) start time, J.

MOUNT added "IF YOU CHOOSE TO DO THIS, YOU ARE OYO [on

your own] TRAILHEAD TO TRAILHEAD.

29. On 22 October 2020, J. MOUNT posted a selfie with three white passenger

vans as a backdrop.  He wrote "Picking up the vans in Vegas. Shout out to

my van drivers…for helping make all this work."

30. On 23 October 2020, J. MOUNT posted check-in procedures for

participants.  He asked everyone to "Check in through me, not the front

desk" because "I have every room key."

31. On 24 October 2020, at about 0500 hours, the J. MOUNT group arrived at

the North Kaibab trailhead on the North Rim.  Many passenger cars came,

including a string of 12 vehicles in rapid succession.  Clusters of people

walking to the trailhead had begun gathering at the North Kaibab trailhead.

Your Affiant observed about 50 people mingling at the trailhead water

station.  A few people had told your Affiant that they were with the

'MOUNT group' and that they were expecting to be picked up by a

passenger bus on the South Rim.  However, nearly all groups were

extremely reluctant to speak about their plans, their leader, and their event.

Your Affiant observed many clusters of people – several in excess of 11 – leave the trailhead at separate times from about 0500 hours to 0540 hours.

32. Preventative Search and Rescue (PSAR) Ranger Andrew Sprutta was in plainclothes at the North Kaibab trailhead. PSAR A. Sprutta wrote "200-250 people departing the [North Kaibab] trailhead" between about "0455 and 0630 hours." He added "Many of the hikers told me that they were part of a large group of a 100 or more from all over."

33. The J. MOUNT group made its way through the canyon. Preventative Search and Rescue (PSAR) Ranger Cody Allinson, who was stationed at the Manzanita Resthouse, observed "organized groups of 9 to 10 people entered the day use area near Manzanita Ranger Station. From approximately 0730 and 0800 I witnessed approximately 150 people enter the Manzanita day use area. At peak of visitation, there were approximately 70 people within the day use area, an area which is roughly the size of half a basketball court. In my 7 months of work…I have never have [sic] witnessed so many individuals travelling in the same direction in such a condensed period of time and space." PSAR Ranger C. Allinson added people were "unable to properly socially distance" since most people were "not wearing face coverings." PSAR Ranger C. Allinson stated that everyone had said they had "9 or 10" people in their group and that when asked how they knew each

other, group members said "they only knew a few people in their group but would not explain how they met."

34. Park backcountry visitor Ricard Landon wrote in a complaint on 24 October 2020 that while hiking on the North Kaibab trail, he was "Overwhelmed with very high numbers of people coming from the North Rim." He felt the "quality of our hike [was] extremely diminished" because it "took an additional two hours to finish our itinerary to the North Rim as we waited for people all morning long," including long lines at get water at the Manzanita Resthouse where "we saw about 80 people" without any "social distancing."

35. Park visitor Brian Duane encountered the group on the North Kaibab Trail and stated: "We encountered a BIG group of hikers…there was no social distancing, nobody was wearing masks, the group size was way out of control…This alone delayed our progress significantly….It seemed that at least part of this was an organized group."

36. The J. MOUNT hiking group fragmented into clusters as it continued across the canyon. Upon reaching Indian Garden, Interpretative Ranger Brandon OATES wrote in his statement that the groups "did not interact, avoided talking to each other, or pretended not to know each until they were leaving." He overheard group participants "talking to each other about

remaining in smaller groups to prevent being seen in larger groups" and

observed "Small radios were used to communicate between smaller groups."

37. USPR Katherine McHugh, while stationed at Indian Garden, contacted two

J. MOUNT group hikers, Mike Julian and Ashely Hedlund.  USPR K.

McHugh wrote the two hikers admitted they were with the MOUNT group,

and "MOUNT advised them that they were hiking on their own now since

the National Park Service advised him not to bring a large group on a rim-to-

rim hike." USPR K. McHugh wrote that M. Julian and A. Hedlund "paid

him [J. MOUNT] $95" for the hike.

38. PSAR Ranger William Wise was on patrol at the Bright Angel trailhead

between 1510 hours and 1705 hours.  He stated he had contacted many rim-

to-rim groups and they said they "were part of a 'large group.'" PSAR

Ranger W. Wise contacted a group of four participants, and they stated to

him that they were "'hiking as part of a large group – but don't worry, we

split up.'" PSAR Ranger W. Wise continued to talk to J. MOUNT group

participants, including a woman in her 20s who "confirmed that the shuttle

vans were supposed to start at 6pm." He also observed a J. MOUNT group

leader using a "white 'walkie-talkie' style radio with grey digital camouflage

pattern…to communicate" with individuals on the trail.

39. PSAR Ranger Anne Jehle, who was shadowing USPR C. Oakes, was patrolling the Bright Angel trailhead and had contacted several J. MOUNT participants. PSAR Ranger A. Jehle wrote she had contacted about 10 rim-to-rim hikers who "stated they were associated with the large, organized group led by Joe Mount." She wrote that she had spoken to a male subject and asked him if he were associated with the J. MOUNT group, to which the man replied in the affirmative and then "bumped [her] on the shoulder and stated that he was not supposed to tell [her]."

40. USPR Adam Sherman drove south to Tusayan and contacted Jason Parry of JetLimo, a driver of one of the passenger charter buses associated with the J. MOUNT group. J. Parry showed accountability documents and text messages from J. MOUNT. In one such document, J. MOUNT had written: "One of the passengers (or the bus driver himself/herself) MUST text me a picture of the paper prior to leaving Tusayan. This will indicate to me which 56 passengers are on each of the two buses (totaling 112)." J. MOUNT advised the driver to "communicate with me via my cell: 360-269-3974 (text/call)."

41. J. Parry also showed text messages from J. MOUNT. In one such text message, J. MOUNT wrote: "The reason I booked the bus from our hotel in Kanab to the north rim [sic] is because we have about 30 personally owned

vehicles sitting there that my hikers left this morning. They need to be able to get there to retrieve the vehicles and get back to Kanab."

42. Grand Canyon National Park Superintendent, Edward T. Keable, had enacted a Covid-19 mitigation plan that temporarily modified commercial group size limits to 10 individuals, including guides and drivers. Through his investigation, USPR A. Sherman learned that JetLimo did not have a Covid-19 mitigation plan. J. MOUNT disregarded the park's Covid-19 mitigation plan by instructing JetLimo driver J. Parry to transport an excessive number of people to the North Rim of Grand Canyon on 25 October 2020 and coordinating a trip of more than 10 individuals.

43. USPR A. Sherman contacted J. MOUNT shuttle van drivers Contessa Mensink and Joseph Dillion. USPR A. Sherman wrote that he "saw these drivers transport 12 hikers in their vehicles…from the park to the motor coaches in Tusayan multiple times. Neither Dillion nor Mensink had valid CUAs to legally transport paying passengers in Grand Canyon National park," nor did they have Covid-19 mitigation plans.

44. On 25 October 2020, after the event, PSAR Ranger A. Jehle was dispatched to the Bright Angel trailhead for a medical patient. While at the trailhead, PSAR Ranger A. Jehle wrote that she was talking to the patient's friend who was upset that the patient was left behind by the J. MOUNT group. A. Jehle

stated that the unidentified friend said "the patient was resistant to calling for

help...due to her understanding that the National Park Service charges

$10,000 for Search and Rescue services.  The patient's close male friend

stated that someone in the organized group had informed the patient that

calling for help would result in a charge of $10,000; he stated that the patient

was nervous she would be charged that sum of money and avoided seeking

help."

45. J. MOUNT's efforts in coaching participants to circumvent park rim-to-rim

hiking rules complicated and interfered with investigative efforts into the

organized rim-to-rim group.  USPR C. OAKES wrote due to "hikers'

obvious reluctance to speak with me in a forthcoming manner, I did not

obtain much significant or specific information.  I was frequently told that

MOUNT was believed to still be down in the canyon, and throughout my

time at the trailhead I was often told that he was about '30 minutes down

trail.'"

46. USPR A. Sherman wrote in his statement "Every participant I contacted was

not willing or cooperative with us.  It was obvious they had been coached

not to identify with their fellow trip participants." USPR A. Sherman

attempted to call J. MOUNT to ask for his location within Grand Canyon.

According to USPR A. Sherman, J. MOUNT declined to "tell [him] his location."

47. Interpretive Ranger B. Oates wrote in his statement: "Groups appeared to be coached or instructed to avoid talking to Park Rangers in uniform," and added that "Groups said they were below 10 people" and that "members did not know everyone in their group."

48. USPR Katherine McHugh stated "Many hikers throughout the day were evasive and inconsistent with me and I suspected many hikers were avoiding ranger contact or being untruthful in their responses to my questions."

49. **J. MOUNT** knowingly and willfully disregarded the park's Commercial Use Authorization (CUA) requirements by conducting or engaging in commercial operations in the park without a permit. Your Affiant had advised J. MOUNT during the phone call on 8 October 2020 that any person soliciting business in the park, or engaging in business in the park, such as by collecting funds and organizing services, requires a CUA permit, and that engaging in business within the park without a permit is prohibited.

50. J. MOUNT collected registration fees in exchange for services and hired staff to assist with operations. J. MOUNT charged participants a $95 registration fee, which included rim-to-rim guidance, trip itinerary, transportation and lodging services. J. MOUNT posted he collected about

$15,185 from his participants for the rim-to-rim hiking event. According to

posts and documents, J. MOUNT planned to spend $15,120, which included

$7000 for two National Charter buses, $849 for 3 passenger vans, $4,424 for

hotel lodging, as well as $2,847 for drivers' tips, meals, fuel, carpool drivers,

add-ons and other incidentals.

51. The financial information showed that J. MOUNT planned to compensate

people for their work: $95 for each of the three van drivers and one carpool

driver, $195 for "Andy's Logistics," $95 for "Rosie's Logistics," and $800

for 8 drivers' meals, or $100 each. Another $400 was allocated for bus

driver tips.

52. J. MOUNT knowingly profited from leading this commercially organized,

rim-to-rim group hiking event. J. MOUNT admitted he would be receiving

a net profit of "$65.11" and it would be enough to "buy...a new pair of

hiking poles."

53. Following the event, on 25 October 2020, participant Mel Porter posted, "I

think Joe did a fantastic job. How about we give 'our guide' a bonus for all

the extra hard work he did planning an [sic] weekend of memories!!!"

Participant Jessica Stoker posted "least we could do is Venmo Joe Mount

$10 for putting together this experience."

54. Based on the foregoing, your Affiant respectfully submits there is Probable

Cause to believe, on or about 24 October 2020, in Grand Canyon National

Park, in the District of Arizona, Joseph D. Mount did violate the following

federal regulations:

a. Title 36, Code of Federal Regulations, Section 2.32(a)(3) states:

Knowingly giving a false of fictitious report or other false information

(i) to an authorized person investigating an accident or violation of

law or regulation.

b. Title 36, Code of Federal Regulations, Section 2.32(a)(1) states:

"Intentionally interfering with a government employee or agent

engaged in an official duty, or on account of the performance of an

official duty."

c. Title 36 Code of Federal Regulations, Section 5.3 states: Engaging in

or soliciting any business in park areas, except in accordance with the

provisions of a permit, contract or other written agreement with the

United States, except as such may be specifically authorized under

special regulations applicable to a park area, is prohibited.

d. Title 36 Code of Federal Regulations, Section 1.5(f) states: Violating

a closure, designation, use or activity restriction or condition schedule

of visiting hours, or public use limit, is prohibited (public use rim-to-rim group size limit)

 f. Title 36 Code of Federal Regulations, Section 1.5(f) states: Violating a closure, designation, use or activity restriction or condition schedule of visiting hours, or public use limit, is prohibited (Covid-19 mitigation use limit).

  **Pursuant to 28 U.S.C. § 1746(2), I declare that the foregoing is true and correct to the best of my knowledge and belief.**

             Timothy Hopp
             U.S. Park Ranger
             National Park Service
             Department of the Interior

  X  Sworn by telephone and subscribed before me on this  4th  day of May, 2021.

CAMILLE D. BIBLES
United States Magistrate Judge